AO 106 (Rev. 04/10) Application for a Search Warrant (Modified: WAWD 10-26-18)

```
┌─────────────────────────────────┐
│ ──── FILED ──── ──── LODGED       │
│ ──────── RECEIVED                 │
│        Mar 24, 2020               │
│     CLERK U.S. DISTRICT COURT     │
│ WESTERN DISTRICT OF WASHINGTON AT TACOMA │
│ BY ──────────────────── DEPUTY    │
└─────────────────────────────────┘
```

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

In the Matter of the Search of              )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )      Case No.  MJ20-05068
Five cellular phones in the custody of the Drug )
Enforcement Administration, more fully described in )
Attachment A                                )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Five cellular phones, more fully described in Attachment A, incorporated herein by reference.

located in the _____ Western _____ District of _____ Washington _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession of Controlled Substances with Intent to Distribute |
| 21 U.S.C. § 846 | Conspiracy to Distribute Controlled Substances |

The application is based on these facts:

✓ See Affidavit of Special Agent Steven Meyer continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☐ by reliable electronic means; or ☐ telephonically recorded.

_____
*Applicant's signature*

Steven Meyer, Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
⊙ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: _____ 03/24/2020 _____                    _____
*Judge's signature*

City and state:  Tacoma, Washington _____          Theresa L. Fricke, United States Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

STATE OF WASHINGTON    )
                           )      ss

COUNTY OF PIERCE         )

      I, Steven Meyer, being first duly sworn on oath, deposes and says:

## I.  AFFIANT BACKGROUND AND EXPERIENCE

      1.      I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

      2.      I am a Special Agent with the Drug Enforcement Administration ("DEA"), and have been since March 2017.  I am currently assigned to the Seattle Field Division, Tacoma Resident Office.  Prior to my employment with the DEA, I worked as a Uniformed Officer with the Secret Service in Washington D.C., from June 2006 to April 2009, and as a contractor for missile defense from 2010 to 2016.  I received formal training at the DEA Basic Agent Training in Quantico, Virginia.  The four-month Basic Academy included comprehensive, formalized instruction in, among other things, basic narcotic investigations, drug identification and detection, familiarization with United States narcotics laws, financial investigations and money laundering, identification and seizure of drug-related assets, organized crime investigations, physical and electronic surveillance, and undercover operations.

      3.      During the course of my law enforcement career, I have been involved in investigations of numerous criminal offenses, including the offenses involved in this current investigation.  I have participated in criminal investigations of illicit drug trafficking organizations, ranging from street-level dealers to major dealers, to include Mexico-based drug trafficking organizations.  These investigations have also included the unlawful importation, possession with intent to distribute, and distribution of controlled

1  substances; the related laundering of monetary instruments; the conducting of monetary
2  transactions involving the proceeds of specified unlawful activities; and conspiracies
3  associated with criminal narcotics offenses.  These investigations have included use of
4  the following investigative techniques: confidential informants; undercover agents;
5  analysis of pen register, trap and trace, and toll records; physical and electronic
6  surveillance; wiretaps; and the execution of search warrants.  I have had the opportunity
7  to monitor, listen to, review transcripts and line sheets (prepared by linguists)
8  documenting the content of intercepted conversations involving the trafficking of
9  cocaine, heroin, methamphetamine, and other narcotics, by persons who used some form
10 of code to thwart law enforcement.  I have also interviewed defendants at the time of
11 their arrests and have debriefed, spoken with, or interviewed numerous drug dealers or
12 confidential sources (informants) at proffer interviews who were experienced in speaking
13 in coded conversations over the telephone.  I have gained knowledge regarding the
14 various methods, techniques, codes, and/or jargon used by drug traffickers in the course
15 of their criminal activities, including their use of cellular telephones and other electronic
16 devices to facilitate communications while avoiding law enforcement scrutiny.

17                          **II.      PURPOSE OF AFFIDAVIT**

18         4.      This Affidavit is submitted in support of an application for a warrant to
19 search the following five cell phones, seized on March 11, 2020, and presently in the
20 secure custody of the DEA in Tacoma, Washington (collectively, the "SUBJECT
21 PHONES"), and which are further described in Attachment A, for evidence, fruits and
22 instrumentalities of drug trafficking committed by Eder RAMIREZ PINO and Rigoberto
23 GARCIA RIOS, in violation of Title 21, United States Code, Sections 841(a)(1) and 846,
24 as further described in Attachment B.  The SUBJECT PHONES are more particularly
25 described as follows:

26         a.      **A black iPhone cell phone, IMEI 353889103632856, number 253-**
27         **495-5754,** seized from RAMIREZ PINO's Audi A8 on March 11, 2020, and
28         assigned DEA exhibit number N-1;

b.      **A red iPhone, IMEI 353967103374842, number 253-861-8393,** seized from RAMIREZ PINO's Audi A8 on March 11, 2020, and assigned DEA exhibit number N-2;

c.      **A black Samsung S9 cell phone, IMEI 353306092285182, number 253-754-8445,** seized from RAMIREZ PINO's Audi A8 on March 11, 2020, and assigned DEA exhibit number N-7;

d.      **A black iPhone cell phone, number 206-234-9380,** seized from Rigoberto GARCIA RIOS's Toyota Tacoma on March 11, 2020, and assigned DEA exhibit number N-8; and

e.      **A white iPhone cell phone,** seized from Rigoberto GARCIA RIOS's work room at the Seattle/Tacoma Box Company on March 11, 2020, and assigned exhibit number N-9.

In my training and experience, I know that the SUBJECT PHONES have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the SUBJECT PHONES first came into the possession of the DEA.

5.      My knowledge of the facts set forth in this Affidavit is a result of my personal participation in the investigation, my conversations with other law enforcement personnel participating in this and related investigations, and my review of relevant documents.  I have obtained and read the official reports prepared by various law enforcement officers participating in the instant investigation, and other investigations discussed herein.

6.      I know through training and experience, as well as the training and experience of other law enforcement officers familiar with this investigation, that individuals involved in the distribution of controlled substances and other criminal activity often use vague references and/or coded words and phrases when discussing illegal activity.  In this investigation, these communications have been conducted in both the English and Spanish languages, and the participants frequently used coded language

AFFIDAVIT OF Steve Meyer - 3
USAO #2020R00258

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  to refer to drug-trafficking activity.  When coded words and phrases were used in the

2  instant investigation, I have used my training and experience, as well as the training and

3  experience of other law enforcement officers familiar with this investigation and

4  information provided by confidential sources participating in this investigation, to include

5  what I believe to be an accurate translation of these coded words and phrases inside

6  parentheses throughout this Affidavit.

7      7.      Since I am submitting this Affidavit for the limited purpose of establishing

8  probable cause to obtain search warrants for the cell phones identified above and in

9  Attachment A, I have set forth only the facts that I believe are necessary to establish

10  probable cause for these warrants.  As set forth herein, I believe that Eder RAMIREZ

11  PINO and Rigoberto GARCIA RIOS used these phones to facilitate drug trafficking, in

12  violation of Title 21, United States Code, Sections 841(a)(1) and 846.

13                    **III.    CONFIDENTIAL SOURCES**

14      8.      Confidential Source One ("CS1") has been providing information to DEA

15  investigators for approximately three years.  More specifically, CS1 has provided reliable

16  information which has resulted in arrests and seizures of narcotics, including

17  methamphetamine.  This information has benefited multiple law enforcement

18  organizations, to include agencies at the Federal and State level.  The information

19  provided by CS1 has been corroborated and considered reliable.  CS1 is providing

20  information for monetary compensation and other legal considerations.  CS1 has a

21  criminal history that includes one felony arrest related to drug trafficking in 2002.

22      9.      Confidential Source Two ("CS2") has been providing information and

23  assistance to the DEA since 2015.  CS2 has a criminal history consisting of one felony

24  burglary conviction is 2012 and two felony drug trafficking arrests in which no charges

25  were filed in 20016 and 2008.  CS2 is currently providing information and assistance to

26  the DEA in exchange for monetary compensation and immigration benefits.  Since 2015,

27  CS2 has provided reliable information and assistance to the DEA in numerous drug

28  trafficking investigations.  CS2 has conducted more than twenty controlled drug

AFFIDAVIT OF Steve Meyer - 4
USAO #2020R00258

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 purchases and provided information that was proven reliable and led to the arrest and

2 convictions of numerous drug traffickers.  CS2 is familiar with the appearance of

3 methamphetamine, cocaine, and heroin, and the way they are packaged, transported, and

4 sold.

### IV.   SUMMARY OF PROBABLE CAUSE

#### *Investigative Overview*

7      10.    This investigation began as a joint law enforcement operation between the

8 DEA, the West Sound Narcotic Enforcement Team, and Bremerton's Special Operations

9 Group, and is ongoing.  I have personally participated with the other agents and law

10 enforcement officers involved in the investigation.

11      11.    In January 2020, CS1 informed me that there were two drug traffickers

12 operating in Tacoma, Washington, capable of delivering heroin and methamphetamine.

13 At that time, CS1 provided a phone number for each target.  A few days later, CS1 told

14 agents that one of the targets wanted to provide heroin and methamphetamine to CS1.

15 Agents directed CS1 to set up a meeting with the target.

16      12.    At the end of January 2020, agents arranged for the acquisition of

17 methamphetamine and heroin from the target, utilizing CS1.  A Hispanic male, later

18 identified as Eder RAMIREZ PINO, arrived at a pre-arranged meeting with CS1 in a blue

19 2013 Nissan Maxima, Washington license BNR6295, and provided CS1 with

20 approximately 30.9 gross grams of suspected methamphetamine and 32.7 gross grams of

21 suspected heroin.  These substances later field-tested positive for the presence of

22 methamphetamine and heroin, respectively.  Investigators searched CS1 and his/her

23 vehicle before and after the meeting with RAMIREZ PINO and found no contraband

24 items during either search.  After the meeting, agents followed the blue Maxima to an

25 apartment building on 97th Street Court S in Tacoma, Washington, where they observed

26 the driver entering a stairwell.

27      13.    Based on records obtained from the Washington Department of Licensing

28 ("DOL"), agents were able to positively identify RAMIREZ PINO as the person who

AFFIDAVIT OF Steve Meyer - 5
USAO #2020R00258

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  provided CS1 with methamphetamine and heroin.  The blue Maxima that arrived at the
2  meeting with CS1 was registered to RAMIREZ PINO at an apartment in the Tacoma
3  apartment complex that agents saw the driver of the Maxima enter after the meeting.
4  Moreover, agents later matched RAMIREZ PINO's DOL photograph with the person
5  they had observed driving the blue Maxima.

6                          ***Arrest of RAMIREZ PINO and GARCIA RIOS***

7        14.    On March 11, 2020, agents arranged for the acquisition of six kilograms of
8  methamphetamine and ten ounces of heroin from RAMIREZ PINO, utilizing CS2.  CS2
9  advised agents that RAMIREZ PINO wanted to meet with CS2 to talk about the deal
10 prior to getting the narcotics for CS2.  Investigators searched CS2 and his/her vehicle
11 prior to the initial meeting and before and after any subsequent interactions with
12 RAMIREZ PINO and found no contraband items during any of those searches.  Agents
13 set up surveillance at the pre-arranged location for the meeting between RAMIREZ PINO
14 and CS2, and they observed RAMIREZ PINO arrive in a 2004 Audi A8, which is
15 registered to RAMIREZ PINO at an address in Tacoma, Washington.    Shortly
16 thereafter, agents observed CS2 meet with RAMIREZ PINO for a brief period.

17       15.    After the meeting, agents spoke with CS2, who stated that he/she and
18 RAMIREZ PINO had discussed the quantity and price of controlled substances that
19 RAMIREZ PINO could provide, and that RAMIREZ PINO had shown CS2 a sample of
20 heroin that RAMIREZ PINO retrieved from the Audi.  According to CS2, RAMIREZ
21 PINO left the meeting to retrieve the drugs and would be returning later that afternoon to
22 conduct the deal.

23       16.    After the meeting, RAMIREZ PINO left the area in the Audi A8, which he
24 drove to the Seattle/Tacoma Box Company and parked in a lot just outside of the gated
25 entrance to the company's industrial property.  RAMIREZ PINO remained there, parked
26 and sitting in his vehicle, for more than half an hour.  RAMIREZ PINO remained in the
27 parking lot until a 2015 Toyota Tacoma, Washington license C02578N, pulled into the
28 gated area of the box company property and parked.

AFFIDAVIT OF Steve Meyer - 6
USAO #2020R00258

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    17.    Moments after the Toyota Tacoma arrived, agents observed RAMIREZ
2  PINO drive his vehicle past the business gates and onto the business property.  The
3  Hispanic male driver of the Toyota Tacoma, later identified as Rigoberto GARCIA
4  RIOS, exited the truck and walked towards RAMIREZ PINO's vehicle.  A few minutes
5  later, GARCIA RIOS returned to the Tacoma and drove it to the area in which
6  RAMIREZ PINO was parked.  Agents observed GARCIA RIOS and RAMIREZ PINO
7  meet with each other for a short period of time, after which agents saw GARCIA RIOS
8  exit the Tacoma and approach a 2001 Volkswagen Jetta bearing Washington license plate
9  BSJ4961 that was parked on the box company's property.  GARCIA RIOS pulled a black
10  bag out of the Jetta, which looked like it contained an object of some kind.  GARCIA
11  RIOS carried the black bag to RAMIREZ PINO's Audi, where he quickly lowered it into
12  the trunk.  GARCIA RIOS then took the black bag out of the trunk of the Audi, and
13  agents observed that the bag appeared to be empty.  GARCIA RIOS then returned to the
14  box company and RAMIREZ PINO drove away from the area.

15    18.    Agents observed RAMIREZ PINO drive back to the deal location and meet
16  with CS2 again.  After a brief meeting, RAMIREZ PINO departed and drove directly
17  back to the Seattle/Tacoma Box Company.  Agents established surveillance at the
18  business and noted that RAMIREZ PINO's vehicle was again parked next to the Toyota
19  Tacoma in the box company's parking lot. At the time of this second meeting, the gates
20  to the box company property were closed and secured, and agents believed that the two
21  men were using the security fencing/gate of the business as an extra layer of protection
22  for drug trafficking.

23    19.    Agents moved to detain RAMIREZ PINO and GARCIA RIOS.  RAMIREZ
24  PINO was stopped in his vehicle as he exited the parking lot, and GARCIA RIOS
25  attempted to hide on the box company's property but was quickly apprehended.  Both
26  RAMIREZ PINO and GARCIA RIOS were arrested and given Miranda warnings, which
27  they acknowledged and agreed to waive to speak with agents.

28

20.     An agent asked RAMIREZ PINO what was in his Audi sedan, and RAMIREZ PINO admitted that drugs were in the vehicle and that he was going to deliver them to someone in Tacoma.  RAMIREZ PINO also stated that he received the drugs from someone while on the box company property, but would not provide GARCIA RIOS's name.

### *Search of the Audi and Tacoma*

21.     A DEA Task Force Officer ("TFO") employed a drug-sniffing canine on GARCIA RIOS's Tacoma and RAMIREZ PINO's Audi and received alerts for the presence of drugs on both vehicles.  Agents searched RAMIREZ PINO's Audi and seized approximately 3 kilograms of suspected methamphetamine and 10 ounces of suspected heroin, which tested positive for the presence of methamphetamine and heroin, respectively.  Additionally, agents seized **a black iPhone cell phone with IMEI 353889103632856, a red iPhone with IMEI 353967103374842**, and **a black Samsung S9 cell phone with IMEI 353306092285182** from the front console of RAMIREZ PINO's Audi sedan.  An agent asked RAMIREZ PINO who the phones belonged to, and RAMIREZ PINO stated that all three were his.

22.     When agents searched the Tacoma, they found and seized **a black iPhone cell phone, phone number 206-234-9380**, which was sitting on the center console and charging.

### *Search of GARCIA-RIOS's Workplace*

23.     While RAMIREZ PINO and GARCIA RIOS were being interviewed, agents contacted the night manager of the box company, who stated that GARCIA RIOS was a supervisor at the facility.  A short time later, the night manager called the head manager of the business, who gave consent to allow agents to search the entire business property.

24.     The night manager informed agents that GARCIA RIOS frequented one of the work rooms at the business, which was the same location where agents had observed GARCIA RIOS before he was apprehended and arrested.  According to the night

1  manager, the work room was most often used by GARCIA RIOS, but several people
2  (including himself) had keys to the room and accessed the room to retrieve cleaning
3  supplies.  The night manager also reported that he had observed GARCIA RIOS
4  accessing the room at odd hours and that GARCIA RIOS left several vehicles, including
5  the Jetta, at the facility.

6       25.    Agents went to the work room and observed that it contained large metal
7  working machines, cleaning equipment, and work benches.  Agents initially located
8  suspected drugs and drug packaging materials in a toolbox in the room.

9       26.    Agents then deployed a drug-sniffing canine in the work room, and the
10 canine alerted to one of the walls in the room.  An investigator used a pre-existing gap in
11 that wall to peer down into the wall, between the studs.  There, he found numerous plastic
12 bags containing a variety of suspected drugs, to include methamphetamine, heroin,
13 cocaine, and what agents believe to be counterfeit oxycodone pills.[1]  The pills were not
14 field-tested, because agents believed, based on their training and experience, that they
15 may contain fentanyl.  The other substances recovered from the work room field-tested
16 positive for the presence of controlled substances.

17      27.    Agents also recovered a **white iPhone cell phone**, which was sitting on a
18 desk in the work room.  An agent asked GARCIA RIOS who the phone belonged to, and
19 GARCIA RIOS said it was his phone.

20      28.    I believe the information contained in these cell phones will provide further
21 evidence in the investigation.  I believe the information will provide details about
22 GARCIA RIOS and RAMIREZ PINO's relationship; which, at this point, I believe is a
23 supplier/courier relationship.  I believe the information on these cell phones will help
24 identify additional members of this drug trafficking organization, such as customers,
25 distributors, and—most importantly—GARCIA RIOS's source(s) of supply.  I also

---

[1] Agents seized approximately 2491.6 gross grams of methamphetamine, approximately 2843.3 gross grams of heroin, approximately 235.4 gross grams of cocaine, and what agents believe to be approximately 995.5 gross grams of counterfeit oxycodone pills from GARCIA RIOS's work room.

1  believe the information stored on these devices will help agents identify additional

2  locations of interest and significance to this investigation, through the use of the stored

3  tracking data or location history that is on or associated to these devices.

4     29. Based on my training and experience, I believe GARCIA RIOS's use of the

5  business property was no accident; it provided a secure and discreet location for him to

6  conduct his drug transactions.  I believe his chosen method of storage (in the walls of his

7  office) and the fact that he used multiple storage vehicles to conduct transactions with

8  RAMIREZ PINO further demonstrate his level of sophistication.  And lastly, I believe

9  the quantities and types of drugs involved in this incident indicate RAMIREZ PINO and

10 GARCIA RIOS are part of a larger criminal organization, with a significant

11 supply/distribution network here in Western Washington.  Again, I believe the

12 information contained in the cell phones agents seized from RAMIREZ PINO and

13 GARCIA RIOS will provide agents with additional information that will be significant to

14 the ongoing investigation into this criminal organization.

15   **VI. COMMON CHARACTERISTICS OF DRUG TRAFFICKERS AND**
16            **MONEY LAUNDERERS**

17    30. Based upon my training, experience, and participation in this and other

18 investigations involving narcotics trafficking, my conversations with other experienced

19 investigators and law enforcement investigators with whom I work, and interviews of

20 individuals who have been involved in the trafficking of methamphetamine, cocaine,

21 oxycodone, fentanyl and other drugs, I have learned and know the following.

22    31. Drug traffickers use mobile electronic devices including cellular telephones

23 and other wireless communication devices to conduct their illegal trafficking business.

24 As described below, such equipment often contains evidence of these illegal activities.

25    32. Traffickers of controlled substances commonly maintain addresses,

26 vehicles, or telephone numbers that reflect names, addresses, vehicles, and/or telephone

27 numbers of their suppliers, customers, and associates in the trafficking organization, and

28 it is common to find drug traffickers keeping records of said associates in cellular

AFFIDAVIT OF Steve Meyer - 10
USAO #2020R00258

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 telephones and other electronic devices.  Traffickers often maintain cellular telephones
2 for ready access to their clientele and to maintain their ongoing narcotics business.
3 Traffickers frequently change their cellular telephone numbers to avoid detection by law
4 enforcement, and it is common for traffickers to use more than one cellular telephone at
5 any one time.
6      33.    Drug traffickers use cellular telephones as a tool or instrumentality in
7 committing their criminal activity.  They use them to maintain contact with their
8 suppliers, distributors, and customers.  They prefer cellular telephones because, first, they
9 can be purchased without the location and personal information that landlines require.
10 Second, they can be easily carried to permit the user maximum flexibility in meeting
11 associates, avoiding police surveillance, and traveling to obtain or distribute drugs.
12 Third, they can be passed between members of a drug conspiracy to allow substitution
13 when one member leaves the area temporarily.  Since cellular phone use became
14 widespread, every drug dealer I have interacted with has used one or more cellular
15 telephones for his or her drug business.  I also know that it is common for drug traffickers
16 to retain in their possession phones that they previously used, but have discontinued
17 actively using, for their drug trafficking business.  Based on my training and experience,
18 the data maintained in a cellular telephone used by a drug dealer is evidence of a crime or
19 crimes.  This includes the following:
20     a.    The assigned number to the cellular telephone (known as the mobile
21 directory number or MDN), and/or the identifying telephone serial number (Electronic
22 Serial Number (ESN), Mobile Identification Number (MIN), International Mobile
23 Subscriber Identity (IMSI) number, or International Mobile Equipment Identity (IMEI)
24 number) are important evidence because they reveal the service provider, allow agents to
25 obtain subscriber information, and uniquely identify the telephone.  This information can
26 be used to obtain toll records, to identify contacts by this telephone with other cellular
27 telephones used by co-conspirators, to identify other telephones used by the same
28

AFFIDAVIT OF Steve Meyer - 11
USAO #2020R00258

1   subscriber or purchased as part of a package, and to confirm if the telephone was
2   contacted by a cooperating source.

3          b.     The stored list of recent received calls and sent calls is important
4   evidence.  It identifies telephones recently in contact with the telephone user.  This is
5   valuable information in a drug investigation because it will identify telephones used by
6   other members of the organization, such as suppliers, distributors and customers, and it
7   confirms the date and time of contacts.  If the user is under surveillance, it identifies what
8   number he called during or around the time of a surveilled drug transaction or meeting.
9   Even if a contact involves a telephone user not part of the conspiracy, the information is
10  helpful (and thus is evidence) because it leads to friends and associates of the user who
11  can identify the user, help locate the user, and provide information about the user.
12  Identifying a defendant's law-abiding friends is often just as useful as identifying his
13  drug-trafficking associates.

14         c.     Stored text messages are important evidence, similar to stored
15  numbers.  Agents can identify both drug associates, and friends of the user who likely
16  have helpful information about the user, his location, and his activities.

17         d.     Photographs and videos on a cellular telephone are evidence because
18  they help identify the user, either through his or her own picture, or through pictures of
19  friends, family, and associates that can identify the user.  Pictures also identify associates
20  likely to be members of the drug trafficking organization.  Some drug traffickers
21  photograph groups of associates, sometimes posing with weapons and showing
22  identifiable gang signs.  Also, digital photos often have embedded "geocode" information
23  within them.  Geocode information is typically the longitude and latitude where the photo
24  was taken.  Showing where the photo was taken can have evidentiary value.  This
25  location information is helpful because, for example, it can show where coconspirators
26  meet, where they travel, and where assets might be located.

27
28

AFFIDAVIT OF Steve Meyer - 12
USAO #2020R00258

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    e.      Stored address records are important evidence because they show the
2    user's close associates and family members, and they contain names and nicknames
3    connected to phone numbers that can be used to identify suspects.

4    f.      It is common for drug traffickers to use encrypted means of
5    communication, such as WhatsApp, Signal, Wickr, and Telegram, to attempt to avoid
6    detection by law enforcement.  It is common for drug traffickers to install and use these
7    apps on their phones in order to make encrypted calls and send encrypted messages.

8                                    **VII.   CONCLUSION**

9         34.    For the reasons set forth above, I believe there is probable cause to believe
10   that evidence, fruits, and instrumentalities of violations of Title 21, United States Code,
11   Sections 841(a)(1) and 846, will be found in a search of the five cellular phones seized by
12   law enforcement on March 11, 2020, as more fully described in Attachment A, which are
13   presently in the secure custody of the DEA in Tacoma, Washington.

14
15
16                                    _____
17                                    Steven Meyer
                                      Special Agent
18                                    Drug Enforcement Administration
19
20        The above-named agent provided a sworn statement attesting to the truth of the
21   foregoing affidavit by telephone on this 24th day of March, 2020.
22
23
                                      _____
24
                                      THERESA L. FRICKE
25                                    United States Magistrate Judge
26
27
28

AFFIDAVIT OF Steve Meyer - 13
USAO #2020R00258

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800